**Electronically Filed
Intermediate Court of Appeals
CAAP-12-0000356
11-DEC-2014
08:31 AM**

NO. CAAP-12-0000356

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I


CRAIG M. MCGINNITY-FARRIS, Claimant-Appellee, v.
APEX EXPLOSIVES, LLC, Employer-Appellant, and HAWAII
EMPLOYERS' MUTUAL INSURANCE COMPANY, Insurance Carrier-Appellant


APPEAL FROM THE LABOR AND INDUSTRIAL RELATIONS APPEALS BOARD
(DOCKET NO. AB 2010-211 (K); 4-08-00769)

MEMORANDUM OPINION
(By: Nakamura, Chief Judge, Leonard and Ginoza, JJ.)

Employer-Appellant Apex Explosives, LLC and Insurance
Carrier-Appellant Hawaii Employer's Mutual Insurance Company,
Inc. (**HEMIC**) (collectively, **Apex**, unless otherwise stated) appeal
from a Decision and Order filed January 4, 2012 (**Decision and
Order**) by the Labor and Industrial Relations Appeals Board
(**LIRAB**) affirming in part and modifying in part a May 17, 2010
decision by the Director of Labor and Industrial Relations (**the
Director**) regarding Claimant-Appellee Craig M. McGinnity-Farris's
(**McGinnity-Farris's**) claim for workers' compensation benefits, an
Order Denying Request for Reconsideration filed by the LIRAB on
March 5, 2012, and an Amended Decision and Order filed by the
LIRAB on May 14, 2012 (**Amended Decision and Order**).

I. BACKGROUND

   A. McGinnity-Farris's Work Injury and Subsequent Surgeries

   On June 16, 2008, McGinnity-Farris was employed by Apex
when he sustained a right shoulder injury at work. As a result

of the injury, he was not able to work beginning on June 16, 2008.

As his injury did not sufficiently improve, McGinnity-Farris underwent surgery on his right shoulder on October 14, 2008 for a subacromial decompression and a repair of the Superior Labrum Anterior and Posterior (**SLAP**) lesion. The surgery was performed by Dr. Floyd Pohlman (**Dr. Pohlman**). According to Dr. Pohlman's description of the procedure, the surgery involved creating at least two (2) incisions as Dr. Pohlman described the closing of "ports" after the surgery.[1] One of these ports was described as a posterior portal.

Dr. Pohlman performed another surgery on April 9, 2009, described as a right shoulder arthroscopy, release of the biceps tendon, and open biceps tenodesis. Dr. Pohlman's report indicated that at least three (3) incisions were made: a posterior portal, an anterior portal, and an incision made in the axillary line. It was not indicated whether any of these incisions were made through any of the scars from the October 14, 2008 surgery.

On April 23, 2009, McGinnity-Farris sustained a non-work-related exacerbation of his injury when someone fell and grabbed his arm. He sought treatment at Wilcox Memorial Hospital emergency room on that date. On the following day, April 24, 2009, he was treated by physician's assistant Terrie Johnson (**Johnson**) at Kaua'i Medical Clinic, and consented to surgery to repair the damage done by the re-injury. This surgery took place on April 28, 2009 and was again performed by Dr. Pohlman. The procedure was described as a [right] shoulder arthroscopy with debridement and open biceps tenodesis. Dr. Pohlman's report describes the use of at least four (4) incisions: a posterior

---

[1] In medical parlance, a port is "an opening, passage, or channel through which something can be introduced into the body" such as "an incision . . . for passing a medical instrument (as an endoscope) into the body." Merriam-Webster, *Medical Dictionary*, MEDLINEPLUS, http://www.merriam-webster.com/medlineplus/port (last visited Nov. 6, 2014). A "portal" is a "small (e.g. ± 1-cm) incision over a joint to provide access for arthroscopy." *Medical Dictionary*, THEFREEDICTIONARY.COM, http://medical-dictionary.thefreedictionary.com/portal (last visited Nov. 7, 2014).

portal, an anterior portal, the re-opening and enlargement of the previous incision made during the tenodesis procedure (presumably the incision in the axillary line), and a mid-forearm incision.

On September 16, 2009, HEMIC notified McGinnity-Farris that it had scheduled an Independent Medical Examination (**IME**) with Dr. John Sterling Endicott (**Dr. Endicott**). On December 1, 2009, McGinnity-Farris was examined by Dr. Endicott pursuant to the IME request by HEMIC for an Independent Medical Examination and Impairment Assessment. In his report on the IME and his Impairment Assessment, which was not completed until March 3, 2010,[2] Dr. Endicott noted the following regarding McGinitty-Farris's scars:

> The right shoulder shows arthroscopic scars that are multiple. Anteriorly there is a crossed scar that is 1.5 cm x 2.5 cm. The lateral scar is 1.5 cm normal and flat. The posterior scars are 1.5 cm and 1.0 cm. There are two larger scars with the superior anterior scar at 7.5 cm, and the inferior anterior scar 5 cm.

According to Dr. Pohlman, McGinnity-Farris was released to a home exercise program as of October 6, 2009, he achieved maximum medical improvement as of October 12, 2009, and was cleared to return to work as early as October 13, 2009. This report was sent to HEMIC's claim adjuster, Rose PeBenito (**PeBenito**), on October 12, 2009.

B.    Procedural History

As a result of his work injury, McGinnity-Farris was paid temporary total disability (**TTD**) benefits by HEMIC at a rate of $392.02 per week from June 20, 2008 through October 29, 2009 for a total of $27,833.42. He was also compensated for medical costs associated with his injury in the total of $25,758.74.

Promptly after receiving Dr. Pohlman's report, but while the IME and a report from Dr. Endicott was still pending, HEMIC sent a letter dated October 15, 2009 to McGinnity-Farris and the State Department of Labor and Industrial Relations (**DLIR**), indicating that TTD benefits would be terminated as of October 29, 2009 and notifying them that HEMIC would be

---

[2]    On February 19, 2010, HEMIC wrote to Dr. Endicott noting that his report was overdue and requested that he forward the report.

requesting a credit for overpayment of TTD benefits paid after October 13, 2009.

Shortly after receiving Dr. Endicott's report of his IME and Impairment Assessment, which was dated March 3, 2010, HEMIC sent a letter dated March 12, 2010 notifying McGinnity-Farris and the DLIR hearings officer that it would be seeking credit and/or reimbursement for overpayment of TTD benefits paid out from April 23, 2009 to October 29, 2009 in the amount of $10,640.54 and for medical care benefits paid as of April 23, 2009.

A hearing was held before a hearing officer of the DLIR, Disability Compensation Division on March 18, 2010. Thereafter, the Director issued an initial decision on May 17, 2010 (**Director's Decision**) and later, an amended decision on June 3, 2010 (**Director's Amended Decision**), which was based on certain errors alleged by HEMIC in a May 20, 2010 Request for Reconsideration. The Director's Amended Decision, with notations added to point out the differences between it and the original Director's Decision, includes the following:

> 1. Sections 386-21 and 386-26, HRS, said employer shall pay for such medical care, services, and supplies as the nature of the injury may require up to 4/22/2009. [**original decision did not list a date**]
>
> 2. Section 386-31(b), HRS, said employer shall pay to claimant weekly compensation of $392.02 for temporary total disability from work beginning (waiting period: 6/17/2008 through 6/19/2008) 6/20/2008 through 4/22/2009 for 43.8571 weeks, for a total of $17,192.88.
>
> 3. Section 386-32(a), HRS, said employer shall pay to claimant weekly compensation of $392.02 for 11% permanent partial disability of the arm, beginning 4/23/2009 for 137.2800 weeks, for a total of $23,886.72.
>
> 4. Section 386-32(a), HRS, said employer shall pay to claimant one lump sum of $550.00 for disfigurement as follows: three (3) scars: One (1) 2-inch hyperpigmented, linear, scar on right upper arm, one (1) 1/2-inch hyperpigmented, linear, scar on posterior shoulder, and one (1) 2-inch hyperpigmented, linear, scar on anterior shoulder.
>
> 5. Section 386-52, HRS, employer is authorized to credit of $10,640.54 for temporary total disability benefits paid from 4/23/2009 through 10/29/2009 against the award for permanent partial disability benefits.

On May 27, 2010, McGinnity-Farris sent a letter to the DLIR appealing the Director's Decision.

After an initial conference, the LIRAB issued a pretrial order setting a trial for August 17, 2011, before the LIRAB in Honolulu. The order narrowed the issues to be determined at trial to the following:

a. Whether Employer is liable for, and Claimant entitled to, medical care, services, and supplies after April 22, 2009.

b. Whether Claimant is entitled to temporary total disability after April 22, 2009.

c. What is the extent of permanent partial disability resulting from the work injury of June 16, 2008.

d. What is the extent of disfigurement resulting from the work injury of June 16, 2008.

e. Whether Employer is entitled to a credit against permanent partial disability for temporary total disability benefits paid for the period April 23, 2009 through October 29, 2009 in the amount of $10,640.94.

The parties stipulated that neither would be presenting witnesses and waived their rights to appear in person at the trial, but they reserved the right to submit their respective position memoranda and briefs by October 3, 2011. This stipulation was approved on August 30, 2011. Each party timely submitted their post-trial memoranda.

The LIRAB issued its Decision and Order on January 4, 2012. The LIRAB credited Dr. Endicott's description of McGinnity-Farris's scars as an accurate description of the scars resulting from the work injury and increased the disfigurement award to $1,000. In addition, the LIRAB held in Conclusion of Law (**COL**) 5 that Apex was not entitled to credit against permanent partial disability (**PPD**) for TTD benefits paid for the entire period of April 23, 2009 through October 29, 2009 in the amount of $10,640.94.[3] Specifically, it held that: "Despite being aware of the potentially subsequent intervening event of April 23, 2009 as early as May 1, 2009, Employer did not provide Claimant notice of its intent to seek credit for any overpayments

_____

[3] As indicated below, the October 29, 2009 date was later amended to October 13, 2009.

5

of temporary total disability benefits on this basis until March 12, 2010." However, the LIRAB held that Apex was entitled to a credit for TTD benefits paid from October 13, 2009 through October 29, 2009.[4]

On February 3, 2012, Apex timely filed a Request for Reconsideration of the January 4, 2012 Decision and Order disputing the increase of the disfigurement award and the denial of credit for the overpayment of TTD benefits from April 23, 2009 through October 29, 2009.[5]

The LIRAB issued its Order Denying Request for Reconsideration on March 5, 2012. The LIRAB declined to disturb its increase of the disfigurement award, stating:

> [T]he reports of the first two surgeries note five incisions or portal points, not three, as argued by Employer. The third surgery that Claimant underwent included an incision to his mid forearm, which was not identified in the shoulder area scars described by Dr. Endicott, and which was not included in the disfigurement description by the Board.

Additionally, the LIRAB held "[w]ith regard to the issue of Employer's credit, the Board does not adopt the reasoning posed by Employer. The cases cited by Employer are distinguishable."

Apex timely appealed the Decision and Order and the March 5, 2012 Order Denying Request for Reconsideration on April 3, 2012.

The LIRAB issued an Amended Decision and Order on May 14, 2012 for the purpose of correcting certain typographical errors. Relevant to this appeal, the LIRAB corrected its COL 5 to read: "The Board concludes that Employer is not entitled to a credit against permanent partial disability for temporary total disability benefits paid for the period April 23, 2009 through **October 13, 2009** in the amount of $10,640.94." The LIRAB amended additional language in the same COL to read: "The Board concludes, however, that Employer is entitled to a credit against

---

[4]    As indicated below, the October 13, 2009 date was later amended to October 14, 2009.

[5]    Under Hawaii Administrative Rules (HAR) § 12-47-53, the LIRAB may, at the request of any party, reconsider or reopen its decision within thirty days after mailing a copy of its decision or order.

permanent partial disability for temporary total disability benefits paid for the period October **14**, 2009 through October 29, 2009."

Apex timely appealed from the Amended Decision and Order to the Intermediate Court of Appeals (**ICA**) on May 29, 2012. On July 11, 2012, Apex filed an "Amended Notice of Appeal" which clarified that Apex sought to consolidate its appeals from the LIRAB's January 4, 2012 Decision and Order, the March 5, 2012 Order Denying Request for Reconsideration, and the May 14, 2012 Amended Decision and Order.

II.  POINTS OF ERROR ON APPEAL

Apex contends that the LIRAB erred when it:  (1) increased the Director's initial disfigurement award from $550 to $1,000, a difference of $450; (2) denied Apex's credit against PPD for TTD benefits paid for the period of April 23, 2009 through October 13, 2009.

III. STANDARD OF REVIEW

Judicial review of a LIRAB decision and order is governed by Hawaii Revised Statutes (**HRS**) § 91-14(g) (1993). Duque v. Hilton Hawaiian Vill., 105 Hawaiʻi 433, 437, 98 P.3d 640, 644 (2004).  HRS § 91-14(g) states:

> (g) Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:
> (1)  In violation of constitutional or statutory provisions; or
> (2)  In excess of the statutory authority or jurisdiction of the agency; or
> (3)  Made upon unlawful procedure; or
> (4)  Affected by other error of law; or
> (5)  Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
> (6)  Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

The Hawaiʻi Supreme Court has held that:

> Under HRS § 91-14(g), conclusions are reviewable under subsections (1), (2), and (4); questions regarding procedural defects are reviewable under subsection (3); findings are reviewable under subsection (5); and an

7

> agency's exercise of discretion is reviewable under subsection (6).
>
> The courts may freely review an agency's conclusions of law. The LIRAB's conclusions will be reviewed *de novo*, under the right/wrong standard.
>
> An agency's findings are reviewable under the clearly erroneous standard to determine if the agency decision was clearly erroneous in view of reliable, probative, and substantial evidence on the whole record. An agency's findings are not clearly erroneous and will be upheld if supported by reliable, probative and substantial evidence unless the reviewing court is left with a firm and definite conviction that a mistake has been made.

Tauese v. State, Dep't of Labor & Indus. Relations, 113 Hawai'i 1, 25, 147 P.3d 785, 809 (2006) (citations, internal quotation marks, and brackets omitted).

"Statutory interpretation is a question of law reviewable *de novo*." First Ins. Co. of Haw. v. A & B Props., 126 Hawai'i 406, 414, 271 P.3d 1165, 1173 (2012) (quoting State v. Wheeler, 121 Hawai'i 383, 390, 219 P.3d 1170, 1177 (2009)). With respect to review of an agency's interpretation of a statute, the supreme court has held that:

> Where an administrative agency is charged with the responsibility of carrying out the mandate of a statute which contains words of broad and indefinite meaning, courts accord persuasive weight to administrative construction and follow the same, unless the construction is palpably erroneous.

Stated differently:

> Where an agency is statutorily responsible for carrying out the mandate of a statute which contains broad or ambiguous language, that agency's interpretation and application of the statute is generally accorded judicial deference on appellate review. However, an interpretation by an agency of a statute it administers is not entitled to deference if the interpretation is plainly erroneous and inconsistent with both the letter and intent of the statutory mandate.

Haole v. State, 111 Hawai'i 144, 150, 140 P.3d 377, 383 (2006). (citations and brackets omitted; format altered).

IV.    DISCUSSION

  A.    The Disfigurement Award

Apex contends that the LIRAB erred by increasing the Director's disfigurement award from $550 to $1000, a difference of $450. More specifically, it contends that the LIRAB erred by

basing its increased award on Dr. Endicott's description of McGinnity-Farris's scars.

The LIRAB disagreed with the Director's conclusion that Apex was liable for only three of McGinnity-Farris's scars and modified the order accordingly.

While HRS § 386-32(a) (Supp. 2013) provides a great deal of discretion, the LIRAB may not grant compensation under a worker's compensation statute unless the injury arises out of and in the course of employment. Tate v. GTE Hawaiian Tel. Co., 77 Hawai'i 100, 103, 881 P.2d 1246, 1249 (1994). Here, the LIRAB determined that McGinnity-Farris's April 23, 2009 injury "was an independent, intervening event that did not relate back to his original, June 16, 2008 work injury." Thus, the LIRAB determined the injury on April 23, 2009 "terminated Employer's liability for workers' compensation benefits for the June 16, 2008 work injury," such that "Employer is not liable for, and Claimant not entitled to, medical care, services, and supplies after April 22, 2009." Therefore, the LIRAB could not grant disfigurement awards for scarring incurred because of the April 28, 2009 surgery, as it was not the result of a work injury.

It appears, however, that the LIRAB determined that all of the scars described by Dr. Endicott (a total of at least six)[6], rather than the three scars described by the Director, could be attributed to the workplace injury. Dr. Endicott's IME report does not support this finding.

The LIRAB recognized that Dr. Pohlman's descriptions of the first two surgeries note five incisions.[7] We are unable to

---

[6]  Seven scars if the "crossed scar" is actually taken to mean two different scars that form a cross.

[7]  Apex argues that Dr. Pohlman described only three incision points, apparently missing Dr. Pohlman's description of an incision made in the axillary line and the creation of an anterior portal during the second surgery. The Director's findings listed three scars resulting from the surgery, and Apex argues that the LIRAB should have relied on this finding as the most reliable evidence on record. This finding suggests that at least two of Dr. Pohlman's incisions during the second surgery were made over scars created during the second surgery. However, the LIRAB reviews the Director's decision de novo and need not adopt the Director's findings. HRS § 386-87(b), (c) (1993).

discern how the LIRAB then credited Dr. Endicott's report, which not only lists six or seven different scars, but also does not address which scars could be attributed to the work-related versus non-work-related surgeries. Even accepting the LIRAB's determination that Dr. Endicott did not list the forearm incision caused by the third surgery, the third surgery included at least three additional shoulder incisions that Dr. Endicott could have included among his list of arthroscopic shoulder scars. Thus, as the record does not support a finding that all scars described in Dr. Endicott's IME report were attributable to the work injury, such a finding was clearly erroneous. Tauese, 113 Hawai'i at 25, 147 P.3d at 809.

Accordingly, the disfigurement award is vacated and remanded to the LIRAB for further findings concerning which scars can be attributed to the first two surgeries and a determination of the disfigurement award based on such findings.

B.   Credit for TTD Benefits

Apex argues that the LIRAB erred in denying credit against PPD benefits for TTD benefits paid from April 23, 2009 through October 13, 2009.

HRS § 386-52(a) (1993) provides, in relevant part:

(a) Any payments made by the employer to the injured employee during the employee's disability or to the employee's dependents which by the terms of this chapter were not payable when made, shall be deducted from the amount payable as compensation subject to the approval of the director; provided that:

(1) The employer notifies the injured employee and the director in writing of any such credit request stating the reasons for such credit and informing the injured employee that the employee has the right to file a written request for a hearing to submit any evidence to dispute such a credit;

(2) The deduction shall be made by shortening the period during which the compensation must be paid, or by reducing the total amount for which the employer is liable and not the amount of weekly benefits;

(3) If overpayment cannot be credited, the director shall order the claimant to reimburse the employer. Failure to reimburse the employer shall entitle the employer to file for enforcement of such a decision in accordance with section 386-91.

On October 15, 2009, HEMIC claim specialist PeBenito sent a letter to McGinnity-Farris and the DLIR which read as follows:

> At this time, we are giving notice to you that pursuant to Hawaii Revised Statutes Sections 386-31, 386-31 [sic], 386-33, and 386-52, we are requesting a credit for the overpayment of temporary disability benefits as of October 13, 2009 onward against the award for permanent disability. Also, we are advising you that weekly benefits that we are currently paying to you will be terminated as of October 29, 2009. However, if payments are to be paid after October 29, 2009, they too will be a credit on the permanent disability to be awarded to you for the following reasons:
>
> • On September 17, 2009, you completed a Functional Capacity Evaluation (FCE). The results of the FCE were that you are able to return to work at the light duty level, 8 hours a day.
>
> • On October 4, 2009, physical therapy was completed and you were released to return to work.
>
> • On October 12, 2009, you were seen by the attending physician, Dr. Floyd Pohlman, and Patricia Willet, RN. Ms. Willet has advised us that Dr. Pohlman has reviewed the FCE results with you, released you to return to work, determined that you are at maximum medical improvement and no further office visits are planned.
>
> • It is our understanding that you intend on returning to work in a self-employment capacity and will be opening a flower shop at the Kauai Hilton Hotel.
>
> If you believe that I have overlooked something or misunderstand the opinions of Dr. Pohlman, please let me know. If you disagree with our termination of the weekly temporary total disability benefits and our request for credit, you may request a hearing before the Dept. of Labor, Disability Compensation Division.

On March 12, 2010, nine days after the date of Dr. Endicott's IME and Impairment Assessment report, PeBenito sent another letter to both McGinnity-Farris and DLIR hearings officer Aric T. Fujii, which read in part:

> At this time, we are giving notice to Mr. McGinity-Faris [sic] that pursuant to Hawaii Revised Statutes Sections 386-21, 386-31, 386-32, 386-33 and 386-52, we are requesting a credit and/or reimbursement for the overpayment of temporary total disability benefits as of April 23, 2009 through October 29, 2009 in the amount of $10,64054 [sic] and medical care benefits incurred and paid as of April 23, 2009 to the present in the amount of $4,959.19 against the awards for permanent partial disability and disfigurement. Our position is based on the following reasons:
>
> • Mr. McGinity Farris was involved in a subsequent non-industrial accident and injury to his right shoulder and right upper extremity on April 23, 2009.

• Dr. John Endicott, in his report dated March 3, 2010, opined that the April 23, 2009 incident was a permanent aggravation of the post-operative complication and caused the need for the third surgery on April 23,2 009 [sic] (see pages 18 to 19 of Dr. Endicott's report). Dr. Endicott opined that the failure of the second tenodesis attempt was due to the non-industrial permanent aggravation that occurred on April 28,2 009 [sic] (see page 19 of Dr. Endicott's report). Dr. Endicott opined that the restrictions from working were also due to the non-industrial permanent aggravation that occurred on April 23, 2009 (see page 21 of Dr. Endicott's report).

Therefore, we believe that the subsequent intervening permanent aggravation that occurred on April 23, 2009 resulted in the need for Mr. McGinity-Farris' [sic] further medical care and temporary disability form [sic] work.

If Mr. McGinity-Farris [sic] disagrees with our request for credit and/or reimbursement as requested above, he may request a hearing before the Department of Labor, Disability Compensation Division.

As revised by its Amended Decision and Order, the LIRAB's COL 5 reads:

The Board concludes that Employer is not entitled to a credit against permanent partial disability for temporary total disability benefits paid for the period April 23, 2009 through October [13], 2009 in the amount of $10,640.94.
Despite being aware of the potentially subsequent intervening event of April 23, 2009 as early as May 1, 2009, Employer did not provide Claimant notice of its intent to seek credit for any overpayments of temporary total disability benefits on this basis until March 12, 2010.
The Board concludes, however, that Employer is entitled to a credit against permanent partial disability for temporary total disability benefits paid for the period of October [14], 2009 through October 29, 2009.

The determination that Apex was aware of McGinnity-Farris's re-injury as early as May 1, 2009 comes from the LIRAB's FOF 10 which says:

On April 24, 2009, Claimant saw physician's assistant Terrie Johnson. Ms. Johnson noted that Claimant had been "doing very well until a few days ago, when a friend of his was starting to fall and she reached out and grabbed his arm, pulling on his operative arm and pulling the repair apart." Claimant was admitted for "refixation of the biceps tenodesis."
The evidence indicates that Employer received Ms. Johnson's treatment note on May 1, 2009.

The record includes Johnson's April 24, 2009 note, along with the copy of an envelope addressed to HEMIC from the Kaua'i Medical Clinic postmarked April 30, 2009. The treatment

note and the envelope are marked by time stamps reading "05/01/2009 01:14 PM."

The LIRAB's COL 5 effectively concludes that HEMIC's October 13, 2009 letter provided reasonable notice under HRS § 386-52(a), but its March 12, 2010 letter did not. Apex argues that the LIRAB's interpretation of HRS § 386-52(a) to require an element of timeliness was error as no such requirement is included in the statute. This issue of statutory interpretation is a question of law that we review de novo. First Ins. Co. of Haw., 126 Hawai'i at 414, 271 P.3d at 1173.

HRS § 386-52(a) does not expressly contain a timeliness requirement, nor does a review of case law show that appellate courts have addressed the issue.[8] We conclude that the LIRAB correctly determined that an employer who seeks a credit or reimbursement pursuant to HRS § 386-52(a) must give the required notice within a reasonable period of time.

The Hawai'i Supreme Court has held:

> When the legislative intent [of a statute] is less than clear, however, this court will observe the well established rule of statutory construction that, where an administrative agency is charged with the responsibility of carrying out the mandate of a statute which contains words of broad and indefinite meaning, courts accord persuasive weight to administrative construction and follow the same, unless the construction is palpably erroneous.
>
> The rule of judicial deference, however, does not apply when the agency's reading of the statute contravenes the legislature's manifest purpose. Consequently, we have not hesitated to reject an incorrect or unreasonable statutory construction advanced by the agency entrusted with the statute's implementation.

In re Water Use Permit Applications, 105 Hawai'i 1, 9, 93 P.3d 643, 651 (2004) (citations and internal quotation marks omitted; block quote format altered).

The language of HRS § 386-52(a) is broad, indefinite, and ambiguous as to when notice should be given; it neither provides a deadline for notice nor expressly says that notice may be given at any time. Further, the legislative intent as to when

---

[8] We note that HAR § 12-10-24 requires notice to be given at a certain time; however, this rule appears to be applicable only when an employer seeks credit for advance payments made in lieu of compensation.

notice must be given is unclear.  A review of the legislative history of Act 66 of 1979 (1979 Haw. Sess. Laws, Reg. Sess., Act 66, § 2 at 139) which birthed the notice requirement of HRS § 386-52(a) shows an intent to require an employer to give timely notice before the termination of TTD benefits, but is silent as to whether timely notice was intended to be required for requests for credit.[9]  Thus, the LIRAB's interpretation should be accorded persuasive weight unless it is palpably erroneous.  Haole, 111 Hawai'i at 150, 140 P.3d at 383.  For the reasons set forth below, the LIRAB's interpretation is not palpably erroneous.

Where a time frame for notice is not provided for in the statute, a requirement that notice must be given in a reasonable time may be imported.  Paul's Elec. Serv., Inc. v. Befitel, 104 Hawai'i 412, 420, 91 P.3d 494, 502 (2004).  Without such a requirement, the plain language of HRS § 386-52(a) would allow an employer to request credit no matter how much time has passed since payments were made.  As HRS § 386-52(a)(3) provides that when credit cannot be given, reimbursement shall be ordered, allowing an employer to unreasonably delay notice could result in prejudice to an injured employee.  Thus, the LIRAB did not err by interpreting HRS § 386-52(a) to require an employer to give

---

[9]     Specifically, the committee reports regarding Act 66 only refer to the intent to require timely notice with respect to the termination of TTD benefits.

> The purpose of this bill is to provide a means to settle disputes when temporary total disability benefits are stopped.
>
> . . . .
> This bill would require the employer who ceases payment of temporary total disability benefits to an injured employee . . . to notify the employee and the Director of the Department of Labor and Industrial Relations in writing of such termination at least two weeks before the last payment is made.  The notification shall state the reason for termination of benefits and that if the employee is of the opinion that the employer unlawfully terminated benefits, the employee may make a written request to the department for a hearing.

S. Stand. Comm. Rep. No. 98, in 1979 Senate Journal, at 1046; see also S. Stand. Comm. Rep. No. 428, in 1979 Senate Journal, at 1181; H. Stand. Comm. Rep. No. 834, in 1979 House Journal, at 1551; H. Stand. Comm. Rep. No. 929, in 1979 House Journal, at 1604.

reasonable notice that the employer would seek credit or reimbursement for TTD overpayments.

The next issue is whether the LIRAB erred in determining that the March 12, 2010 letter did not provide notice within a reasonable time. A determination of reasonableness is generally a question of fact when there are factual issues to be determined; however, once factual issues are resolved or the facts are open to only one reasonable inference, it becomes a question of law. Paul's Elec. Serv., Inc., 104 Hawaiʻi at 420, 91 P.3d at 502 (holding that the DLIR and circuit court's determination that the DLIR's delay in giving a notice of violation two years after the completion of an investigation was reasonable was a conclusion of law); Amfac, Inc. v. Waikiki Beachcomber Inv. Co., 74 Haw. 85, 107-08, 839 P.2d 10, 23-24 (1992); see also Hartford Cas. Ins. Co. v. ContextMedia, Inc., __ F. Supp. 2d __, No. 12-cv-9975, 2014 WL 4269062 at *6, (N.D. Ill. Aug. 28, 2014) (whether notice of an occurrence which could result in a claim was given to an insurer within a reasonable time is dependent on the facts of each case, but is a question of law where the material facts are not in dispute).

Here, the LIRAB's determination relied entirely on the fact that Apex was "aware of the potentially subsequent intervening event of April 23, 2009" as early as May 1, 2009, based on the date of a *physician assistant's* treatment note, and therefore was not entitled to a credit for the April 23, 2009 to October 13, 2009 TTD payments. We conclude that this fact, as a matter of law, was insufficient to show that the employer's notice was unreasonable. Given the circumstances described by the LIRAB, we cannot conclude, as a matter or law, that it was unreasonable for the employer to await a report by a licensed physician before discontinuing benefits and/or seeking credit or reimbursement for overpayment of benefits. As evidenced by the LIRAB's Decision and Order, Dr. Endicott's IME and Impairment Assessment report was critical to the LIRAB's own determination of McGinnity-Farris's impairment as a result of the work accident and the effect of the April 23, 2009 non-industrial injury. It

appears that the employer discontinued *future* TTD payments based on Dr. Pohlman's October 12, 2009 report, but awaited the results of Dr. Endicott's IME, which was already scheduled when Dr. Pohlman's report was received, before seeking credit against PPD for the earlier TTD payments.

As noted above, when Dr. Endicott's report had not been received by mid-February, HEMIC notified Dr. Endicott that the report was overdue and requested that he rectify the matter. Within roughly one week of receiving Dr. Endicott's IME report dated March 3, 2010, notice was given to McGinnity-Farris that the employer sought credit for the April 23, 2009 to October 13, 2009 TTD overpayments. The LIRAB does not refer to any evidence in the record of prejudice to McGinnity-Farris resulting from the delayed notice that a reduction in PPD payments was being requested as a result of this overpayment. Under these circumstances, we conclude that the LIRAB erred in relying solely on Apex's receipt of the physician assistant's note in determining that the employer's notice was unreasonable and, therefore, that Apex was not entitled to a credit against PPD for TTD benefits paid for the period April 23, 2009 through October 13, 2009.

V. CONCLUSION

For the foregoing reasons, we vacate, to the extent set forth herein, the LIRAB's January 4, 2012 Decision and Order, as amended by the May 14, 2012 Amended Decision and Order; we remand this case to the LIRAB for further proceedings consistent with this Memorandum Opinion.

DATED: Honolulu, Hawai'i, December 11, 2014.

On the briefs:

Robert E. McKee, Jr.
for Employer-Appellant and
Insurance Carrier-Appellant

Chief Judge

Associate Judge

Associate Judge

16